3-090-587, Resolving the Bar, and 3-090-588, Robert Warren, et al., accounts by Andrea Zinker v. Pacific Life Insurance Company, et al., by employees by Rebecca Rothman. Ms. Zinker? Good afternoon, Your Honors. Counsel? My name is Andrea Zinker, and along with John Burke and Andrew Stoltman, we represent the appellants in this case, Robert and Dolores Moore and John Paul, Deb Paul, and J.P. Ag. Now, these cases stem from fraudulent conduct and theft of an individual named Nevin Gillette while he was acting as the agent or apparent agent of both Pacific Life and American General. Now, the claims that have been raised here involve two separate issues. In regard to Pacific Life, both of the plaintiffs, or in both cases, the plaintiffs have claimed that Nevin Gillette solicited them to take money out of annuities that they had with Pacific Life and invest that money in products that he described as trust accounts and guaranteed investment certificates, or GICs. In doing so, he misrepresented to the plaintiffs that they would accrue interest on these products and that their money would be safe and liquid at all times. And because the plaintiffs had a history of investing through Pacific Life, they believed that these products were being purchased in conjunction with Pacific Life. The second issue that's addressed in both the claims against Pacific Life and American General is that in regard to both the Moors and the Pauls, Nevin Gillette committed a scheme of twisting or churning the insurance policies whereby he solicited the plaintiffs to take existing policies that they already had. So in the case of the Moors, he solicited them to take existing Pacific Life policies and convert those to a Pacific Life annuity, basically in order to get additional commissions. And in the case of the Pauls, he solicited them to take Pacific Life annuities and purchase American General policies. He also, in regard to JPAG, he, Mr. Gillette, misrepresented to the plaintiffs that they had too much money invested in certain American General policies and that the only thing that they could do was to use those funds to purchase policies for JPAG's employees. So based on these misrepresentations, JPAG purchased five American General policies for their employees. With the exception of the Moors, did Mr. Gillette ever tell the plaintiffs that the product they were buying was another Pacific Life policy or product, the gifts or the trust accounts or the other insurance product or whatever it was he told them he... I mean, I know it's the Moors and the twisting that he did, but with the others, I didn't find it clear in the record. Well, as to the twisting on both issues, the plaintiffs in both cases believed that they were purchasing either Pacific Life or American General products. In regard to the twisting that occurred, and that is in both the Moore and the Paul cases, both plaintiffs did believe that they were purchasing products in conjunction with Pacific Life. I mean, these plaintiffs had a long history of investing through Nevin Gillette in Pacific Life products, and that's how he would treat it. Even though Pacific Life is an insurance company, he wasn't selling these products solely as insurance products. He was selling them as investment products and for their investment value, and he would often solicit his clients under the guise that this is a better investment, you're going to get a better interest rate with this product. And so based on this long history, based on the fact that Nevin Gillette was held out by Pacific Life, they would receive correspondence and statements from Pacific Life that said, if you have questions about your policies, contact your representative, Nevin Gillette. So based on all of these circumstances, the plaintiffs believed that they were purchasing products in conjunction with Pacific Life, just as they had done in the past. So the Pauls were told, even as they gave up their Pacific Life policy and bought one from the other defendant, they thought they were buying a Pacific Life policy. What happened when it got mailed to them? No, Your Honor. In that case, and that's the claims that are as to American General, they were aware that they were buying American General policy, but those are the twisting claims of twisting the insurance policy from one policy to another policy. In terms of the agency issue, it seems to me with the Pauls, and maybe this is what Justice O'Brien was thinking about, could Pacific Life possibly have been a principal when there was just one change and it was not to a Pacific Life policy? Well, as to... The second Pacific Life policy. Right. As to John, Paul, Deb, Paul, and J.P. Ag, our position is that those claims are against American General and not Pacific Life. Okay. So they weren't trying to... Those plaintiffs are not trying to hold Pacific Life liable for products that were converted to American General, but rather they're trying to hold American General responsible for their agent who was soliciting them to convert other policies to American General, which obviously American General benefited by him doing this. What did your clients believe with regard to the nonexistent investments? Well, Your Honor, that's what I was getting into before. They at all times believed that they were investing with those investments. They believed they were investing in conjunction with Pacific Life. That was money that was coming out of one Pacific Life policy that they had and being used to invest in these GICs and trust accounts. Now, these GICs are common investment terms in insurance products, and so it's not unreasonable that our clients would believe that Nevin Gillette was selling them an additional Pacific Life product. I mean, they had a history of doing that. He would tell them, you know, I've got a better product that provides better interest, a better investment for you, and they would transfer money to that new policy. I mean, the Moors transferred money in, I believe, in 2001 from one Pacific Life policy to another, I guess in 99, based on this exact same premise that it was a better investment. And again, then in 2001, they were asked to invest money in a trust account, and they believed that they were doing so in conjunction with Pacific Life. Were they told that it was Pacific Life? First of all, with the annuity, were they told that it was Pacific Life when they were switching the insurance to the annuity, or that those were Pacific Life? Were they told that? I believe they were aware that it was a Pacific Life annuity. As I stand here, I don't know specifically what Nevin Gillette told them regarding that annuity, but they knew that they were buying an annuity through him through Pacific Life. Aren't those the kinds of allegations that you need to make in your complaint in order to survive the motion to dismiss? Well, Your Honor, I think we've alleged enough to create the apparent agency. So even if, and he did tell them that they were buying a gig product or a trust account, depending on the plaintiffs, and they, you know, based on their history, based on the apparent agency, the way it appeared to them, they believed that they were investing in conjunction with Pacific Life. And I think this case is very similar to the case of Wabash v. King & Wills Insurance Company, which is out of the, I believe, the Fifth District. And in that case, the court was looking at apparent agency and whether an insurance company should be held liable for the misconduct of its insurance agent when he solicited the customers to purchase a certain insurance policy and then he converted the premiums for his own use. This case really is no different than that. I mean, what Nevin Gillette did was he made misrepresentations to these plaintiffs, and based on his misrepresentations that they were investing in this gig and trust account, the plaintiffs gave him funds to invest and he converted it for his own use. Just as in the Wabash case where the court looked at how the agent was held out by advertisements, by business cards, by prior legitimate dealings, you have all of that in this case. I mean, Pacific Life provided Nevin Gillette with promotional materials. If someone from the public contacted Pacific Life, they would give them Nevin Gillette's contact information. And I think most importantly, these plaintiffs were given statements and confirmations from Pacific Life in regard to their products that would say, you know, your representative is Nevin Gillette. If there's questions, if you, you know, if you want to take out a new policy, if you wanted to take a loan out of your existing policy, the person you do that through is Nevin Gillette. And so I think that's exactly what these plaintiffs were doing. They were dealing with Nevin Gillette as the representative for Pacific Life. So I think there's enough allegations of a parent agency to support the plaintiff's claims. And in what Your Honor was asking as far as the specific allegations for the fraud claims, I think the plaintiffs have alleged specific enough allegations to support the fraud-based claims. Let me ask a question as to that, too, in terms of what relief you're requesting. It's what you're asking here. One of the things you're asking for us to do is to allow it, allow you to amend on a remand. Is that? Well, Your Honor, this case, the defendants filed a motion to dismiss under 2619.1 as a combined. The 2615 portion of their motion to dismiss primarily addressed the agency issue, the fraud claims, and the negligent supervision claims for insufficient pleadings. And then the 2619 portion primarily addressed their motion to compel arbitration. Yet the court then dismissed the entire suit under 2619. And when asked to clarify, his reasoning was that because there was no agency relationship. Is that what you're asking along with the other relief? We're asking the court to reverse the trial court's dismissal. And if Your Honor's find that under 2615 that it should have been properly granted, they'd be remanded and we'd be allowed to amend the complaints. This case, or these two cases, were one of I think about 18 other sister cases where the court heard motions to dismiss. And in many of those other cases, he granted 2615 motions, but he did allow us leave to amend. And in those cases that we've amended, some of them there have been additional motions, but under several of those the defendants have answered. So I think in order to stay consistent with the trial court's rulings in those other cases that are factually identical to these cases, that it would be proper to remand with leave to amend the complaints. I think the dismissal with prejudice was an improper ruling. In regard, I want to hit on the fraud based claims and the fact that we did sufficiently allege specific facts for those fraud claims. As to Pacific Life, it was specifically alleged the dates of when Nevin Gillette made misrepresentations to the plaintiffs. It's alleged what those misrepresentations were. He misrepresented that he was going to invest their funds in gig and trust account products and that those products would earn certain interest rates and that they would at all times be safe and liquid, which ultimately none of this was true. But we did make specific allegations as to that. Likewise, in regard to American General, it specifically alleged the dates as to when this twisting or turning took place. For the Pauls it took place in 2003 and for the Moors it took place in 1999, and it specifically alleged which policies were transferred into the other policies. So I think all of these allegations are specific enough to support our fraud based claims. And I think the plaintiffs have also sufficiently alleged that the defendants had knowledge of Mr. Gillette's conduct. I mean, as the principal for this agent, his conduct is imputed to Pacific Life and to American General, and they should have known what was going on. Had they gone in and audited the files, taken a look at things, they would have seen these gig statements and trust account statements, right along with their Pacific Life statements and their American General statements. And also because of the pattern and because of the history here, I mean, we're not talking two single cases. These were two of 30-some plaintiffs that he was doing this to. So there was a history that Pacific Life and American General should have picked up on in regard to the funds coming out of policies and in regard to the twisting of policies to replace policies. Are American General and Pacific Life related? I believe they're two separate entities. I know they're both represented by the same counsel, but they are two separate entities, and Nevin Gillette was licensed during different periods of time with each Pacific Life and American General. Was he at any time licensed with both of them? As I stand here, I'm not positive on the answer to that. I do know that as far as his dealings with our clients, the Pacific Life products were earlier products, and then later he started soliciting them to purchase the American General products. So he may have still been licensed with Pacific Life, but at that time he was selling American General policies. Thank you. Thank you very much. Ms. Rothman. Thank you. Good afternoon. My name is Becky Rothman. I represent Pacific Life Insurance Company and American General Life Insurance Company, two of the defendants that plaintiffs collectively refer to as the insurance company defendants in all of these cases. And the other 28 as well. And the other 28. Now, I'm going to start off by taking issue with counsel's suggestion that there was a long history here of investments and the comment on, you know, there's 30-some cases. My clients, I represent, to answer your question, Your Honor, American General and Pacific are both separate insurance companies. I represent both of them in this case for now. Nevin Gillette, as alleged in plaintiff's complaints and alleged in all 32 of those complaints, was a writing agent for a number of different insurance companies. He also was a registered securities salesman for a number of different broker-dealers. With respect to the insurance company defendants who I represent, we have four of these cases. American General was involved in four of the 32 cases. Pacific was also involved, I believe, in four of the 32 cases. If you look at each one of these cases, there's not a long history of investments, of replacements, of policy churning, of commission churning. You've got, like you do if you look at the Paul case here, you've got an issuance of a policy which then Nevin Gillette either convinced plaintiff to take a loan out to pay another existing policy, maybe by Protective Life or by some other insurance company that he sold on behalf of as well, or to fund these make-believe GICs and trust accounts and life insurance retirement plans and whatever it was that he was manufacturing. These GICs, to answer another question, there is no allegation that plaintiffs believed that it was a Pacific Life policy or that it was a Pacific Life product or that it was an American General product when they were convinced to liquidate those products to purchase these other funds, these other investment funds. There's no allegation like that. If they could have made that allegation, they would have made that allegation. What they've done, and the best that they can do, is an allegation that says that plaintiffs believed that the money they took from American General's policy were being used to fund other investments made in conjunction with Pacific Life or American General. I don't know what that means. I think it's nonsensical. I think it's nonsensical in this case where they make the exact same allegation with respect, identical with respect to all the other broker-dealers and all the other insurance company defendants. So it's something, you know, what it's not is it's not that they thought that that product, that particular product was a product that my client sold. If you look at the facts that are alleged, they also belie. . . The end product, the trust. Yeah, I mean the imaginary product. It also belies the facts that they allege and how these investments went down. He sold them these trust accounts. If you take Pacific, for example, in the Paul case, he sold them these trust accounts, and he would convince them to liquidate their real investments through Protective Life, who I don't represent, through one of my clients, through, you know, other investments they had. He would convince them to take those funds and invest in these trust accounts, and then to keep funding these trust accounts. Well, this history of opening up these trust accounts and buying these GICs, if you look at plaintiff's allegations, and it's painful, but you've got to look at what they allege with respect to Protective Life and the other broker-dealers. They opened, at least in the Paul case, they opened these trust accounts, and then they were funding additional monies into these trust accounts. You know, so that, I don't believe, suggests that it was a Pacific, it was its own little Pacific trust account policy over here. It was the same investment that they had, that they just kept making additional investments in. And they funded these investments prior to buying my client's products and afterwards. Again, they make an identical allegation with respect to everybody else, with respect to Protective Life, that they believe that it was made in conjunction with Protective Life's products. And it also flies in the face of common sense to think that Gillette was acting as an agent for Pacific or for American General when he convinced them to basically liquidate their policies, liquidate their products, to buy other products that Pacific Life and American General did not sell. Do your clients take any steps to police the activities of individuals that they allow to sell their products, if they incur, you know, like Gillette? I mean, obviously, this probably isn't something I've heard of. Yes, they do, but what they've never done, and what I don't think they could do, is go down to the office of a writing agent and demand to go through every single file he has, including investments that have nothing to do with them. So this allegation that we knew or should have known because we had the ability to audit. What do they do? Well, with respect to replacements, to go to their replacement claims and their terming claims. They have forms that are in place. They will watch agents to see whether agents are terming commissions, if the holding period is detrimental, if it's a short holding period. Those are the facts that are missing from these replacement allegations, okay? Plaintiffs, when you get to the fraud-based claims, which we allege are, we contend are insufficient and must, you know, were properly dismissed in all events. When you get to those claims, they have blanket statements that, you know, Nevin Gillette misrepresented the benefits of replacement or misrepresented the, you know, benefits of liquidating the products. There's no specifics as to what he could have misrepresented. What was it? Was it that, you know, the premiums were better on this policy? Was it that this policy or this product is going to suit your investment needs better? It's going to give you a greater return? Those are the kind of allegations that you see in these fraudulent replacement claims or these twisting claims. In this case, the twisting is, you know, there's one or two policy transactions. Paul, Pacific Life, sold them two policies. Gillette convinced them to take a loan to fund some trust accounts, and then they replaced. They were replaced by American General policies, which then Gillette convinced them to take American General's policies and take loans to fund these kits and then let lapse. The fraudulent misrepresentation claims, if you look at the- In the Moore facts, he goes from Pacific Life to Pacific Life to the trust funds. Right. In the Moore case- What kind of a pattern do you need to show a twist or a turn? Well, I would submit more than one, holding a policy for, I think it was, four years and then converting it to an annuity, which they then exchanged after a year. I believe it was after a year or after two years. After that. They liquidated it. Whatever it was, a year or so. Right. I mean, once you get a slip that says, we want to cash out of your investment, we want all of our money back, there's nothing that my clients can do except for send them direct communication that says, you know, you need to look at this, you need to contact your agent, which I submit was Neb and Gillette. But if they want their money back, we can't hold their money. We can't keep them from their money. I just wanted to know what kind of patterns were legally sufficient or insufficient. I would submit that factually this does not rise to the level that would cause any insurance company to have any sort of red flag pop up and want to pull all of the investments they have with Gillette. And, again, it wasn't, you know, I have to disagree with my colleague, it wasn't a long history. It wasn't that they had a long history of investing with Gillette. But we're involved in four of these cases, unlike Protective Life, who's in all 28 of them, or certain other defendants, insurance company defendants. And so what you're saying is that, you know, if there are 32 individuals that were affected, but because he was selling for so many different entities that he made sure he didn't trigger the, you know, your bells and whistles. If it were all 32, this would be different as to your clients. I would submit it would be much different as to my client. But what about the individuals that we're dealing with in the four cases that involve these two firms that you represent? There was a history that started with one of them in 1999. So we're looking at 8, 9, 10 years there with a lot of activity. There may have been only one conversion from a policy to an annuity, but there was a lot of borrowing money from one thing and transferring it into something else and creating something else. And at some point, it would seem like maybe Pacific Life should look and say, gee, there's a lot of activity here. Maybe I better look and see what my agents do. I'm not sure which case you're referring to. I know that, you know, I don't think there were more than four or five withdrawals of loans. But I submit Pacific Life and or American General had no idea what they were using this money for. I mean, you could need cash and need to withdraw cash, and that wouldn't support necessarily a twisting claim or a churning claim because Nevin Gillette's not making any commissions. Okay. This is a pleading case. So what the trial court said was they didn't allege, apparently based on your motion, they didn't make sufficient allegations to state a claim. The question is, is there enough information for them to be able to do that? And should they be able to go back? And then it's for the trier of fact to determine whether their beliefs were reasonable or not. That's not for you to decide. Right. No, I understand that. And our position is they don't get there. They don't meet that. They don't meet the standard that is necessary in Illinois to state a claim for fraud. And the question for us is can they based on what's in front of us? Based on the facts that are submitted. Can they state a claim? Even if they had amended sufficiently. You're saying with all their amendments on these facts that can be alleged, they couldn't get back to 619? That's what I'm saying. I'm saying that with respect to Pacific in the Paul case for sure because they can't even set forth anything to get past that holistic agency argument. I think it's an interesting point that I haven't thought of before, but I think the issue being raised, I think you spoke to it earlier in response to Justice O'Brien's question, is there a horizontal churning as opposed to a vertical churning? I'm trying to invent my mind. What would it put them on notice? Yeah, I mean if there are 32 people. I don't know because it's not alleged. What is alleged is we were on notice because we could have gone down and audited these files and what we would have found, what plaintiff points to, is these summary consolidated statements that plaintiffs themselves received and weren't able to discern the fraud from. It didn't ring any bells with plaintiffs. It wouldn't have rung any bells with us too. So I don't know. I don't know. What our problem is, is it's not plaintiff. We don't know what allegations or what misrepresentations Gillette made with respect to the replacement. None of that is plot. And I submit to the court that that would be plot if it could be plot. With the history of this case, plaintiff filed a complaint. We moved to dismiss, which is basically verbatim from the one that we filed, and plaintiff decided to amend. They did this across the board with the eight cases that we're involved in, and some of them they were able to try to put forth something that sounded like a replacement issue, but, again, didn't meet the mark the way that it should under Illinois law for fraud-based claims. And others, they completely failed to allege anything like that on. And not all of those are before you. No, I understand that. It was a concept that I hadn't thought about. Yeah. I know. So do you have anything more? No, any questions? Any questions? Thank you. All right. Thank you very much, Ms. Rothman. And Ms. Inker? Well, Your Honors, I would first like to address the last thing that Ms. Rothman was talking about in regard to the eight other cases and us being able to replete. These were the only two cases that were dismissed with prejudice. These are the only two cases that have been appealed. The others are still alive and in front of the court. So there are additional allegations that have come to light since the filing of these complaints that can be added to these complaints. You were asking about the supervision and the churning and what should have come to their attention that would have alerted them to this churning of the policies. Nevin Gillette was a member of a group called Insurance Designers. American General and Pacific Life contracted with Insurance Designers. And under that contract, if he kept a policy for a year, he would get 120 percent of that first-year commission. So he had big incentive to keep it for a year. And actually, the facts support that. In the cases of the Moors, he solicited them to purchase that second Pacific Life annuity or to replace with the Pacific Life annuity in 2001. He kept it for about 14 months, which we've learned is the triggering point. And then he solicited them to take a loan out to invest in this GIC. That was a common practice in not only these cases but other cases. So I think there are additional allegations that could be raised that supports at least giving us an opportunity to amend the complaints. Is there such a thing? I'm making this word up, but, I mean, is there a horizontal churn here? I mean, if you were to amend it, I mean, or is that, is there, I'm not aware of it. Well, I'm not sure unless the horizontal churning would be the theft that he's committed. Otherwise, it's the churning to the policies. Defendant also raised the issue about the fact that there's a number of different insurance companies and a number of different broker-dealers involved here, and that is true. And under Illinois pleadings, we are allowed to make alternative pleadings against different defendants. Now, to allege that the same allegations have been made against each defendant isn't exactly true. In the specific counts for each defendant, we have, we've pulled out the facts that are specific to that defendant and the allegations and the claims that are being raised against that defendant. So, for instance, he may have been with one broker-dealer for a period of time, and we're holding them liable for investments that occurred during that time frame. Now, in these cases, he was with Pacific Life for a period of time. He was being held out as their representative, and so in regard to Pacific Life, we are holding him responsible for those funds that were taken out of the plaintiff's Pacific Life annuities, the $37,000 from the Moore's annuities and the $20,000 from Deb Paul and the $128,000 that came out of John Paul's annuities. But it's not a matter of communal pleading or pleading the same allegations against each defendant. I mean, we have been specific as to the various defendants. And I think, finally, the most important thing here is that Nevin Gillette was acting as their representative. I know they want to get out of it on the grounds that this is some outside product that they were purchasing, the gigs and the trust accounts, but he was acting as their representative when he made misrepresentations that enabled him to convert funds from these plaintiffs. In the Wabash case that I previously cited, the court reasoned as to why they held the insurance company liable. They reasoned that when one puts another in a position in that capacity that allows them to make such misrepresentations, they shouldn't then be allowed to deny liability for that conduct. And that's exactly what's happened here. Pacific Life put Nevin Gillette in a position to be able to make misrepresentations to convert the plaintiff's funds. American General put him in a position to be able to twist insurance policies. And those companies shouldn't now be allowed to say that they're not liable for his conduct. They should have been watching over what he was doing. Is that enough that they put him in a position to sign him? Every agent they have is in a position to commit fraud. And that's true, but they need to be watching over him. I mean, we've alleged they didn't audit his offices. They didn't go to see, you know, they didn't take a look at the fact that policies would be twisted after or churned after 14 months or that if you looked at all of his insurance products as a whole, there were several cases where money was being pulled out, that the policies were being twisted. I mean, if they had taken steps to actually oversee their agent, they should have known this was going on. And so I think that's why they should be held liable for Nevin Gillette's fraud. Your Honors, based on these reasons, we would ask that you either reverse the trial court's ruling or at least remand it back and grant us leave to amend the complaint. Thank you, Ms. Sinker, and thank you both for your argument today. We will take this matter under advisement and get back to you with a written disposition within a short period. We will now take a short recess for parents.